# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Nicole Holder, | : | Case No. 1:05CV2402 |
| Plaintiff | : | |
| v. | : | Magistrate Judge David S. Perelman |
| City of Cleveland, | : | |
| | : | **MEMORANDUM OPINION** |
| Defendant | : | |

The complaint in this action brought by Nicole Holder against her former employer, the City of Cleveland, advances two claims for relief.

The first asserts "Violations of Equal Pay Act 29 U.S.C. §§206.216," alleging that while in the position of Project Director in the City's Water Division the plaintiff was paid "a salary substantially lower than the salary paid other employees of different races, ages and genders with identical job titles." It is clear that the references to employees of other races[1] and ages is meaningless, as the Equal Pay Act only prohibits an employer from discriminating:

> ...between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

---

[1] Although in the three depositions taken by plaintiff's counsel in the record, which along with the plaintiff's deposition have been reviewed in full by this Court, there were intimations of racial discrimination, the plaintiff being African-American, no cognizable claim of that nature exists int his action.

29 U.S.C. §206(d).

The second asserts a "Common law contract claim," and alleges that the plaintiff was promised by her superiors that if she assumed additional responsibilities for a program entitled "ADP" she would receive an increase in salary to the level being paid other Project Directors, and that they failed to do so.

The action is now before this Court upon the defendant's motion for summary judgment.

The plaintiff's employment with the City began on October 2000 when she was hired by the City Prosecutor in a position titled Public Information Officer.  In December of 2003, when the plaintiff was working as a Misdemeanor Investigator, she lost her job by reason of general lay-offs resulting from a budget crunch in the Prosecutor's office.  It appears that at that time her salary was at about the $30,000 level.

She learned that the Water Department was hiring, and after attending a job fair held by that department was hired into the position of Project Director on December 22, 2003.  When hired her salary was set by Mr. Julius Ciaccia, then the Commissioner of the Division of Water, at $40,000.  In an affidavit Mr. Ciaccia stated:

> I made the decision to offer Ms. Holder a salary of $40,000.00 as a Project Director working in the Division's Training Unit even though some Project Directors were being paid as much as $50,000.00.  I took into account Ms. Holder's relatively short tenure with the City and the fact that she was only being paid a salary of around $30,000.00 while at the Prosecutors Office.  I felt that to pay Ms. Holder $50,000.00, an increase of $20,000.00, should only be considered after having sufficient time to evaluate her skills and work ethic.

This representation is consistent with the recollection of Ms. Annette Pope, who was the Assistant Commissioner under Mr. Ciaccia.  When deposed by plaintiff's counsel she responded to a question

2

why the plaintiff's starting salary was set by Mr. Ciaccia at a level less than that being earned by another female Project Director by stating "I know that she was making considerably less than that, and I believe that he felt that at that time that was a substantial increase."

In April 2004 the plaintiff applied for a transfer to the City's Office of Equal Opportunity, and began working as a Contract Compliance Officer on April 26, 2004. Her salary in that position was at the $48,000 level.

In August 2004 the OEO Director requested of the Civil Service Commission that the plaintiff's probationary period be extended for an additional sixty days. At about that same time the plaintiff wrote the following memorandum to Ms. Angela Smith, the Personnel Director of the Water Division:

> Currently, I am a 120 day Probationary-transfer employee with the Department of OEO. April 26, 2004 I was transferred from the Division of Water to OEO. Based on Rule 8.10 of the Civil Service Law, I may be re-transferred back to my original classification at the Division of Water prior to the ending of my 120 day probationary period at the Department of OEO.
>
> At this time, I am requesting to be re-transferred back to my classification at the Division of Water as soon as possible. Thank you for your time and I would greatly appreciate your immediate assistance in this matter.

When deposed the plaintiff testified that her decision to return to the Water Division was in large part based upon her belief that there were irregularities in the OEO office to which she did not wish to be a party.

While the City disputes the plaintiff's contention that she was entitled to return to the Division of Water, her request to do so was granted. Ms. Smith, in her deposition, was quite clear that the plaintiff was told that she would be returning at her previous earning level, testifying:

3

> Q. Okay. At some point, did you have a conversation with Ms. Holder explaining that she couldn't keep her $48,000 salary if she came back to water.
>
> A. I told her that if we returned her that she would be returning to the job that she left in and the salary she left in.
>
> Q. So if she was making $40,000 before, she's going to go back to $40,000 when she returns.
>
> A. Yes.

While it is not clear from the plaintiff's deposition exactly when or how she learned of the circumstance, the plaintiff testified that at some point before she transferred to OEO she became aware that she was earning less than her coworkers, and she approached her direct supervision, Mr. Daniel Beears, about that disparity. She testified that when she did so he stated "He knew nothing about it. He wold look into trying to see what was going on and trying to, you know, find out why and rectify it." She further stated that upon her return to the Water Division she continued to pursue the matter with Mr. Beears.

Upon her return to the Water Division the plaintiff was assigned by Mr. Beears to work on a project identified as ADP, a date processing system used to record personnel information. In his deposition Mr. Beears stated:

> A. Well, when Nicole Holder returned, I was glad to have her back. There was city-wide initiative related to ADP that just happened to be starting in August or September where the city was upgrading its ADP system. It had been used in the past for payroll purposes, but there was now a city-wide initiative to use it for all kinds of things, related documentation, labor relations documentation, filling out PIDs and getting approval for all those kinds of things on a city-wise base. There's all kinds of, number one, planning that needed to be done, training that needed to be done on the city-wide basis and in water.
>
> And with Nicole returning, this was, I thought, a perfect project for

>her to work on and I worked on it was here.

Mr. Beears did not recall any discussions with the plaintiff regarding her salary before her return to the Water Division, and specifically denied that there were any at the time of her assignment to the ADP project. His recall was:

> Q. So you're saying at no time did you discuss her salary with her after this ADP issue came about?
>
> A. I wouldn't say that. I was aware of her inequity in salary. She mentioned it to me, I would say, in November was the first I was aware of it. Actually, walking back from City Hall on the way back from training, she mentioned that she—she was at $40,000 that they had not allowed her to keep her salary at 46 or 48, so I was aware of it—it was cold outside. I think it was November or December of 2004. So for a while, I was not aware of even what her salary was.
>
> Q. Okay. So as of November, she brings this to you?
>
> A. Yes.
>
> Q. Did you have any response, or did you just ignore it, or what happened?
>
> A. I didn't have an immediate response. I did say I would work on her behalf to bring about an increase.
>
> Q. Okay. But you're saying that was after you asked her to work on the ADP?
>
> A. Yes.

Under date of July 11, 2005 Mr. Beears, at the plaintiff's request, write a "To Whom It May Concern" letter on the plaintiff's behalf. It outlined her service in the Water Division, and the concluding paragraph read:

> Ms. Holder—through no fault of her own—makes substantially less than the other trainers in the Employee Training/Development Unit. In view of Ms. Holder's accomplishments and contributions to the

> Division of Water and to the ADP initiative on a city-wide basis, I would heartily endorse any increase for Ms. Holder to bring her salary in line with the other salaries of the trainers in the Employee Training/Development Unit.

Mr. Beears testified that at about the same time he recommended to Ms. Pope, both by e-mail and in person, that the plaintiff's salary be adjusted, and that "the answer was that the was not the right time for this request, that its best to wait."

In late July the plaintiff, by reason of her unhappiness over her salary situation, refused to do any more work on the ADP project. As a result of that refusal Mr. Beears initiated a disciplinary proceeding. On July 22, 2005 a pre-disciplinary conference was held, at which the plaintiff took the position that she "did not consider work in the ADP system as a part of [her] job duties." This led to a written reprimand being issued by Mr. J. Christopher Nielson, Commissioner of Water, finding her guilty of neglect of duty and insubordination, and warning that "future violations of this nature may lead to further progressive disciplinary action."

On August 10, 2005 the plaintiff sent Mr. Nielson, Mr. Beears and Ms. Pope the following e-mail:

> At the advice of legal Counsel, I am writing to understand why I am constantly being berated with questions to resolve your ADP problems. I thought it was understood that I am no longer working with ADP since the exchanged promise you made to me in December 2004 to correct my salary inequity has not been fulfilled by you to date, 8 months later.
>
> The constant questioning is as if I am being pressured to resign. I hope that is not the case. I have ceased from asking you why you are not fulfilling your promise to correct my salary inequity. Thus, I hope the questioning about my resolution to your ADP problems will cease as well.

This resulted in Mr. Beears' issuing a pre-disciplinary letter to the plaintiff the next day setting a

6

hearing for August 15th, which was rescheduled for August 25th after the plaintiff complained of insufficient notice. That hearing was not held, because on August 19th at 4:00 p.m. the plaintiff tendered, by e-mail to Mr. Nielson, Mr. Beears and Ms. Pope, notice of her immediate resignation.

This action was commenced approximately seven weeks later.

During the time period relevant to this action there were five other employees in the Training Unit of the Division of Water, the unit in which the plaintiff worked, who carried the job title of Project Director.[2] Four of those were female, and their salaries were all at least $10,000 higher than that of the plaintiff. Those disparities are of no consequence to the plaintiff's claim of an Equal Pay Act violation, as they are of the same gender as the plaintiff.

The male's salary level was nominally $48,074.00. He was not, however, actually paid that amount. He had retired from the City in June 2002, after working in various positions for just over thirty years, and was hired back into the Water Division in July 2003 as a part time Project Director working two seven hour days a week. Depending upon whether the prorated salary was on a thirty-five or forty hour work week,[3] his actual yearly earnings would have been $19,230.00 or $16,826.00.

Given these essentially uncontroverted basic facts, this Court must conclude that the defendant is entitled to the summary judgment it seeks.

Plaintiff's breach of contract claim fails on varying levels.

First and foremost, as a public employee/civil servant of the City of Cleveland the plaintiff's employment is legislatively controlled, and is not subject to individual contract. See, Cobb v.

---

[2]In defendant's motion it is represented that in the Water Division there are twenty to twenty-five employees who carry that job title. Plaintiff does not contend that her earning level should be measured against that of a Project Director in any other unit, and when deposed conceded that she had no knowledge of the job duties and responsibilities of Project Directors in other units.

[3]Which of these it was is not known.

Village of Oakwood, 789 F.Supp. 237 (N.D. Ohio, 1991), aff'd 959 F.2d 234 (table) (6th Cir. 1992); Fuldauer v. Cleveland, 32 Ohio St.2d 114 (1972); Cook v. Maxwell, 57 Ohio App.3d 131 (1st Dist. 1989).

Next, there would be a lack of consideration for the alleged promise of an increase in wages by virtue of the plaintiff working on the ADP project. There is no evidence that performing such duties was anything other than something the plaintiff was obliged to do in the regular course of her employment.

Finally, even accepting the plaintiff's version of her discussion with Mr. Beears and Ms. Pope regarding an increase in salary for undertaking the ADP project it is clear that she knew they did not have the authority to increase her salary and that their representations to her were that they would endeavor to get her a raise. In plaintiff's own words, Ms. Pope allegedly said to her "if you do this for three months and implement this here in the training department, we will use it as an excuse, okay, to get your salary corrected with Chris Nealson."

The fact is that after the plaintiff was working on the ADP project Mr. Beears attempted to secure a raise for her, and was rebuffed by those who had the authority to grant his request. This being so, if (a) it was possible for a contract to have been created by virtue of the discussions between the plaintiff and Mr. Beears and/or Ms. Pope, and (b) the plaintiff's working on the ADP project could have provided consideration for that contract, it is clear that there was no breach of that contract as the promise of Mr. Beears/Ms. Pope was not that if the plaintiff worked on the ADP project she was guaranteed a raise, it was that if she did so they would endeavor to secure a raise for her, and that promise was kept.

This Court finds three flaws in the plaintiff's Equal Pay Act claim.

The first of these is that Mr. Matas, against whom the plaintiff's earning level must be measured, was not a full-time employee, as was the plaintiff, being paid more than the plaintiff. He was a part-time employee being paid less than the plaintiff, albeit based upon a yearly wage scale in excess of that applicable to the plaintiff. Query, would Mr. Mata have been working if the City had to actually pay him at the $48,000 level? The answer is unknown.

Second, to establish a *prima facie* case of an Equal Pay Act violation there must be evidence that the female and male employees are performing comparable work. The fact that they carry the same title does not establish that this is so, for as was held in Brennan v. Owensboro-Daviess County Hospital, 523 F.2d 1013 at 1017 (6th Cir. 1975) "Application of the equal pay standard is not dependent on job classification or titles but depends rather on actual job requirements and performance." In her deposition the plaintiff acknowledged that she knew little about the work Mr. Mata actually performed, beyond the fact that she understood that he did computer training. With the record reflecting that employees of the City who carry the job title of Project Director perform a variety of duties, this Court finds that the plaintiff has failed to demonstrate the requisite comparability between the work she and Mr. Mata actually performed to support a finding that a disparity in their "on paper" earning levels would be violative of the Equal Pay Act.

Third, the Supreme Court has stated that the Equal Pay Act "contemplates that a male employee with twenty years seniority can receive a higher salary than a woman with two years seniority," Corning Glass Works v. Brennan, 417 U.S. 188, 204 (1974).

This record reflects that when he retired in 2002 Mr. Mata was a thirty-year employee of the City whose salary basically increased in modest yearly increments over those many years until it

9

reached $46,225,[4] the level he was actually earning when he retired, slightly below the "on paper" earning level established when he returned as a part-time employee in July 2003. The plaintiff had only been with the City for a little over three years when she became Project Director in December 2003. In this Court's opinion, this twenty-seven year difference in their service with the City is plainly "a differential based on any other factor than sex," as is allowed by the Equal Pay Act, insofar as the difference between the pay levels of the plaintiff and Mr. Mata is concerned.

    Final judgment will be entered in defendant's favor.


                                                        s/DAVID S. PERELMAN
                                                        United States Magistrate Judge


DATE:    November 27, 2006

---

[4] It took Mr. Matas from 1996 to 2002 to see his earnings go up by $8,000, the increase the plaintiff was seeking.